**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**J.S. and A.S., as Parents and Next Friends**                    **PLAINTIFFS**
**of Child Doe, a Minor**

**VS.**                    **No. 4:05-CV-01599 GTE**

**EAST END SCHOOL DISTRICT, *et al.***                    **DEFENDANTS**

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

Plaintiffs J.S. and A.S. are the parents of Child Doe ("Doe").  Plaintiffs allege that their

son has been discriminated against because of his disability and denied a public education free

from discrimination and retaliation.  Doe has been diagnosed with autism, Ausberger's

Syndrome, and attention deficit ("ADHD").  Plaintiffs seek damages and injunctive relief for

alleged violations of 42 U.S.C. § 1983, § 504 of the Rehabilitation Act, the Americans with

Disabilities Act ("ADA"), and supplemental state law claims for outrage, assault, and

professional negligence.

The Defendants are East End School District, Mark Tyler, Mary Frey (hereinafter referred

to collectively as "the School District Defendants") and Kelli Rainey.  Defendant Rainey is a

special education supervisor employed by the Arch Ford Educational Cooperative to provide

technical assistance to school districts within the Cooperative's service area.

Both the School District Defendants and Rainey have filed motions for summary

judgment.  For the reasons stated below, the Court concludes the Defendants are entitled to

judgment as a matter of law on some, but not all of Plaintiffs' claims.  Plaintiffs' claims for

outrage and professional negligence, their individual capacity ADA and § 504 claims, and

constitutional claims will be dismissed.  The case will be set for trial solely on the remaining

ADA and § 504 claims.  The Court will also consider at trial Plaintiffs' assault claim.[1]

## PROCEDURAL OVERVIEW

On October 21, 2005, Plaintiffs filed their Complaint in this matter.  On May 17, 2006, the School District Defendants filed their Motion for Summary Judgment.  The motion was filed fifteen days after the Court issued a Final Scheduling Order scheduling this case for a November 27, 2006 bench trial.

On September 27, 2006, Defendant Kelli Rainey sought an extension of the motion deadline in order to file a separate summary judgment motion noting that she wished to ensure that her motion was "considered at the same time as the pending motion for summary judgment as both motions together may be dispositive of the case."  (Doc. # 32 at ¶ 4).  On October 30, 2006 Defendant Rainey filed her motion for summary judgment.  Plaintiffs sought and were granted several extensions of time to respond to the motion.  On February 13, 2007, Plaintiffs submitted their response in opposition to Rainey's motion. On February 26, 2007, the Court granted Defendant Rainey's request for additional time to file a reply brief.  On March 27th and 28th, 2007, Defendant Rainey filed her reply brief, completing the briefing on all summary judgment issues.[2]

In responding to the summary judgment motions, Plaintiffs repeatedly point out that no discovery has been done in this matter, implicitly suggesting that granting summary judgment would be premature or that the Court should apply a more relaxed summary judgment standard. However, Plaintiffs never sought to postpone the Court's consideration of the summary judgment

---

[1]  The School District Defendants have not moved for summary judgment on that claim. The Court directs Plaintiffs to address in their trial brief the legal and factual basis for that claim.

[2]  The Court notes that Rainey submitted several new exhibits in connection with her Reply Brief.  The Court has not considered such exhibits in rendering its decision herein.

motion in order to conduct any necessary discovery.  This is the appropriate remedy for summary judgment motions filed prematurely.  See Fed. R. Civ. P. 56(f).

Additionally, Plaintiffs arguably waived any objection to the Court's taking up and ruling on summary judgment issues prior to formal discovery by representing to the Court that discovery was being postponed <u>voluntarily</u> for the express purpose of allowing the Court to make summary judgment rulings.[3]  On September 27, 2006, the parties jointly moved for a continuance, requesting that the case be removed from the trial calendar so that the Court could rule on the summary judgment issues which might "otherwise negate the need for conducting discovery and/or preparing further motions and pretrial documents."  (Doc. # 31 at ¶ 2).  The parties explicitly acknowledged that they had postponed otherwise expensive discovery pending a summary judgment ruling "in the interest of their clients."  *Id.* at ¶ 3.  The joint motion was signed and submitted to the Court by Plaintiffs' counsel.

For both reasons, the Court considers the summary judgment issues before it ripe for decision and rejects the suggestion that Plaintiffs have been prejudiced by a lack of opportunity for discovery.

## FACTUAL BACKGROUND

Defendants Mark Tyler and Mary Frey are employed by Defendant East End School District ("EESD").  Mr. Tyler is the superintendent.  Ms. Frey is principal of the Anne Watson Elementary School, a school within the EESD (hereinafter, "the School").  Defendant Kelli Rainey, an employee of the Arch Ford Educational Cooperative, provides technical assistance to

---

[3]  The Court notes that Plaintiffs were provided with all Doe's educational records in May of 2005 in connection with Plaintiffs' administrative claims pursuant to the IDEA.  Defendant Rainey represents that such records constitute the materials that would have been provided as mandatory disclosures in this lawsuit.  Thus, it appears that Plaintiffs have had access to all relevant documents.

four of the thirty-eight school districts within the Cooperative's service area, including the EESD. Ms. Rainey has no authority over any of the EESD teachers or officials. Ms. Rainey attended some but not all of Does' special education conferences. Ms. Rainey was not present at the School on a day-to-day basis.

Child Doe was enrolled as a fourth-grader in Anne Watson Elementary School in Bigelow, Arkansas, at some point prior to January 2003.[4] Child Doe transferred to the EESD from Maryland. A psychological report from his former school indicated that Doe had been diagnosed with high-functioning autism and attention deficit hyperactivity disorder. Doe's I.Q. was determined to be within the normal range, which apparently is not uncommon for children with high functioning autism.

The Court has before it Child Doe's educational placement records. Said records provide the best timeline of Doe's educational experience at the School. Plaintiffs have made serious allegations that the records do not accurately reflect what was done to accommodate Doe's disability. For example, Plaintiffs claim that the teachers and staff were not trained to deal with Plaintiff's disability. This allegation is supported by the fact that the record suggests that the first training for staff was not conducted until February 21, 2005, over two years after Plaintiff began attending the School in January of 2003. Plaintiffs further claim the records were falsified, that they were denied access to IEP records, and that the Defendants failed and refused to implement accommodations and services recommended and agreed upon at IEP meetings. The Court will review the records as they appear, pointing out some (but not all) of the discrepancies noted by the Plaintiffs and while fully cognizant of Plaintiffs' position with respect to said records.

---

[4] Plaintiffs assert that Doe was enrolled at some unspecified date prior to January 2003, but that due to an illness the first day he attended school was January 8, 2003.

Child Doe's first day of school at Anne Watson was January 8, 2003. He was initially placed in regular general education classes with a small special education component and placed on a reduced school day from 9:00 a.m. to 3:00 p.m. On the first day of school, Doe tried to run away from the school and he hit and kicked at personnel who tried to keep him from leaving the school grounds. Plaintiffs assert that they were told by Ms. Burge, Doe's special education teacher, that Doe got up from his seat in the Special Education Room and said, "This it not my bag man" (a phrase mimicked from a cartoon) and left her classroom. Ms. Burge allegedly told Plaintiffs that Doe was not angry or belligerent, but that he became fearful and upset when school staff began chasing him. Plaintiffs allege that school staff, not Doe, initiated physical contact.

Defendants assert that in order to prevent Doe from leaving the campus, Ms. Kelly France, a teacher, restrained him with a safety hold. Ms. France was trained in non-violent crisis intervention. Plaintiffs contend that three teachers held Doe down, some of whom were not trained in such intervention. At that time, School staff told Doe that they would contact the police to help find him if he ran away from school.[5] After this incident, Doe continued to run from his classroom and building on occasion, but he did not again attempt to leave the campus. Following this initial incident, Doe's parents indicated their objection to the use of any physical restraints, after which no such restraints were used on Doe.

On January 13, 2003, school personnel met to consider Doe's placement in special education. At this time school officials advised that Doe could be temporarily placed in special education based upon the Individualized Education Plan ("IEP") the parents brought from the previous school district. Defendants describe the educational records as demonstrating that the

_____

[5] Plaintiffs allege that Defendant Frey threatened on many occasions to call the police in connection with Doe's behavior.

parents declined to consent to Doe's placement in special education at this time, stating that they wanted to consider all their options.  (Doe's Education Records at p. 10-11)(hereinafter "Ed. R. __").[6]  Plaintiffs contend that they did not see this entry until January 21, 2003, at which time Doe's mother advised Rainey that this statement was not true since they had all agreed to postpone placement decisions due to a lack of necessary documentation.  This is cited by Plaintiffs as an example of Defendant Rainey's falsifying or sanitizing IEP documents.  Plaintiffs further state that "they were never provided IEP documents as required during meetings and never saw the documentation that Kelli Rainey provided until sometime later, or sometimes not at all."  (Doe's mother's Aff., Exh. A to Pl.'s Response to Rainey's motion).

On January 21, 2003, the IEP team reconvened again, following receipt of additional records from the previous school.  Once again, Doe's parents declined to consent to evaluation or special education placement, stating that they wanted to discuss their options with an attorney or advocate.  (Ed. R. 19).

On February 3, 2003, an IEP team meeting was held.  During this meeting, Doe's parents agreed to an initial placement in special education.  (Ed. R. 25).  The parents also consented to allow the school to conduct several evaluations on Doe.  (Ed. R. 27).  Pursuant to the agreed upon placement, Doe was placed in a regular fourth grade classroom with indirect services from a special education teacher.  At the parents' request, the School agreed to allow Doe to begin his school day an hour later than usual to assist him in making the transition from home to school in the mornings.  (Ed. R. 35-37).  It was further agreed that Doe would be provided occupational therapy, speech therapy, and counseling services.  (Ed. R. 37).

---

[6]  Unless otherwise indicated, the Court's reference to Doe's Education Records refers to those records submitted by Rainey as  Doc. 13.  Many of the same records have also been submitted by the School District Defendants.

After this meeting, Defendant Rainey recommended that EESD seek consultative services from Dr. John Murphy, a behavioral psychologist with the University of Central Arkansas, to assist school staff in dealing with Doe's behavior. (Rainey Aff. at p. 486). EESD responded to this request, contacted Dr. Murphy, and faxed 20 pages of documents. (Ed. R. 201; Rainey Aff. 486). The document provided Dr. Murphy recited the disciplinary problems Doe was exhibiting at school. The School reported that "Doe does not respect authority – He will not participate in academics; He sticks out his tongue and runs down hallway expecting others to chase him." (Ed. R. 202). The School checked the box indicating that it was dealing with an "urgent disciplinary situation" and it specifically requested assistance for "alternative procedures for discipline." *Id*. This document was written on February 11, 2003.

On February 14, 2003, the IEP team convened. During that meeting the committee agreed that due to Child Doe's difficulty in adjusting to school that homebound instruction was appropriate. (Ed. R. 65). There is no record evidence that Doe's parents opposed this placement. Also at this meeting, Doe's parents requested and the School permitted the previously scheduled testing to be delayed to give Doe an opportunity to adjust to new medication. (Ed. R. 67).

From February 14, 2003 through the remainder of the school year, Doe received educational and related services from the EESD as a homebound student. (Ed. R. 72).

Following the February 14, 2003 meeting, Defendant Rainey recommended that EESD seek consultative services from Easter Seals Outreach Program to better serve Doe. The District agreed and contacted Easter Seals. On March 18, 2003, Deena Griffis, an Easter Seals consultant, observed Doe during a homebound lesson and interviewed school staff. Ms. Griffis wrote a four-page letter to Ms. Burge, Doe's special education teacher, providing specific recommendations for the IEP committee's consideration. (Ed. R. 96-99).

In May 2003 Dr. Murphy completed the recommendations to address Doe's episodes of classroom disruption, running and refusal to do schoolwork. (Ed. R. 115-125). Dr. Murphy indicated that he did not believe the staff needed training in order to implement his recommendations. (Ed. R. 125). Plaintiffs allege that Dr. Murphy did not witness Doe in the school environment, which is part of the reasons he was unaware of the need for training.

On May 27, 2003, an evaluation conference was held to consider the various evaluations completed on Doe. While testing indicated Doe was functioning in the average range of intellectual ability and his achievement was commensurate with his educational ability, his scores on the Asperger Syndrome Diagnostic Scale indicated it was very likely he had Asperger's Syndrome, an autism spectrum disorder often referred to as "high functioning" autism. The IEP team classified Doe under the autism category for special education purposes. (Ed. R. 72-83).

The IEP team developed an IEP for the 2004-05 school year. Under the plan, Doe was to return to the regular school setting, where the majority of services would be provided in the resource classroom, with some regular class time. (Ed. R. 151). The IEP provided for Doe to receive speech and occupational therapy. (Ed. R. 151). The team agreed to incorporate the recommendations from Dr. Murphy as Doe's behavior plan. (Ed. R. 153, 164). The School agreed to call a parent for discipline. (Ed. R. 153). Both of Doe's parents signed their agreement to the IEP. They were also provided a copy of the IEP on May 28, 2003. (Ed. R. 165).

Doe returned to school when school began in August 2003. In October of 2003, Doe's mother requested "an IEP review so that programming and placement could be reviewed along with his behavior intervention plan." (Ed. R. 171). The conference was held on October 27, 2003. The team considered moving Doe to regular class for spelling but ultimately decided not to make any programming or placement changes. Defendant Rainey did not attend this

conference.

On December 5, 2003, notice was given for a conference on December 8, 2003, for the purpose of discussing "ways and ideas to help Doe." (Ed. R. 174). The notice further indicated that Doe's "non-compliance with classroom teachers and recent behaviors may warrant suspension" and indicated that the committee needed to meet to determine what to do to prevent Doe's suspension. *Id.*

At the December 8, 2003 meeting, Doe's mother brought in an example of a schedule for Doe and ask if it would be possible to get Doe's schedule the week ahead. It was noted that Ms. Rainey, who was not present at the meeting, had requested a behavior specialist. The IEP committee agreed that copies of the lesson plans for the coming week would be faxed every Friday to Doe's mother, that the behavior specialist would be contacted, and that Dr Murphy would also be notified. (Ed. R. 177).

Dr. Murphy was contacted and he updated Doe's behavior plan. His recommendations were provided on March 29, 2004. (Ed. R. 276-89). On March 30, 2004, a conference was held for the purpose of considering Dr. Murphy's updated recommendations. At this meeting, consistent with Dr. Murphy's recommendations, the team developed a point system and reward to use in reinforcing desired behaviors. (Ed. R. 232-33). Defendant Rainey attended this meeting.

An annual review of Doe's IEP was held on June 14, 2004. The review indicated that Doe was achieving above average grades in math, language, science and social studies. An IEP was developed for the 2004-05 school year. Doe's educational placement was continued in the resource room with some regular class time. (Ed. R. 244). Both of Doe's parents signed the proposed IEP plan. (Ed. R. 246).

Beginning in September 2004, the EESD filled the position of resource officer by hiring Mike Surrett from the Perry County Sheriff's Office. As resource officer, Mr. Surrett was assigned to monitor alcohol, drug, truancy, student on student and student on teacher violence problems, to build trust for authority figures, and to identify children with problems and to be available to work with students who were having problems. The Defendants indicate that Mr. Surrett talked with Doe several times when Doe was being disruptive and was able to talk Doe into complying with his teacher's instruction. Conversely, Plaintiffs assert that they did not want Mr. Surrett to be involved in any fashion with Doe and that they communicated such to the EESD.

In November 2004, Doe's parents requested a conference to consider homebound placement. During the November 1, 2004 conference, Doe's mother indicated that Doe was being overstimulated at school and needed some downtime away from school. Doe's parents also indicated that Doe would be able to see his counselor more frequently if placed on homebound instruction. (Ed. R. 295). The IEP team agreed to homebound instruction. Defendant Rainey was not present at this meeting.

On February 15, 2005, the IEP team met to review Doe's homebound placement. Defendant Rainey and the parents' advocate, Christy Wallace, were present for the meeting. Plans were made for Doe to return to school on March 1, 2005. It was agreed for the first time at this meeting that Doe would need an aide. (Ed. R. 302).

On February 21, 2005, Defendant Rainey provided an in-service on disability training for School staff. (Ed. R. 447). On March 1, 2005, Roberta Sick (a therapist recommended by Doe's therapist) and Karen Burnette, an autism consultant, provided training to School staff on the topic of autism. (Ed. R. 448).

Doe returned to School as planned on March 1, 2005. EESD advertised for an aide, but experienced some difficulty in hiring one. Different staff temporarily filled in as Doe's aide until EESD was eventually able to hire a full time aide. On April 28, 2005, Karen Burnette was brought in to provide training to the new aide. (Ed. R. 449).

On April 8, 2005, Doe's parents filed a due process complaint before the Arkansas Department of Education contending that the EESD's actions had deprived Child Doe of a free and appropriate education in violation of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1485 ("IDEA"). The complaint asserted that EESD had failed to carry out IEP goals and objectives, accommodations, modifications, and the behavior intervention plan; had failed to properly staff the resource room, to train staff, and to obtain materials and services; and had failed to maintain communication with parents.[7] (Rainey Supp. Ex 2).

On April 14, 2005, an incident occurred between Doe and another student during physical education class. (Ed. R. 308). Doe threatened to kill another male student and asked other students for a marker so he could draw a dotted line on the student and use an axe to cut him up along the line. The threatened student was so afraid he wet his pants. He reported the threat to teachers. The School immediately notified Doe's parents, faxing Doe's mother that same day and requesting a meeting that same day. (Ed. R. 308).[8]

Doe's parents agreed to meet on April 14th. During the meeting, in addition to discussing

_____

[7] The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1221 provides for complaints to be filed and investigated at the state level.

[8] The School issued a notice with a meeting date of April 21, 2005, in compliance with the seven day notice requirement, but asked the parents to waive the notice and to meet immediately. (Ed. R. 308-09). While Doe's parents agreed to waive the customary seven day notice and meet immediately, they refused to discuss anything other than Doe's behavior earlier that day.

the incident that occurred earlier in the day, the IEP committee proposed the option of increasing Doe's special education minutes. Doe's mother asked that Doe's placement not be changed because her advocate wasn't present. The team agreed to meet on April 21, 2005, for the purpose of addressing the proposed change in placement. (Ed. R. 312).

The next day, April 15, 2005, Doe's parents faxed a one-sentence letter to Mrs. Burge (special education teacher) advising that they were denying a change in placement and requesting that Doe be returned immediately to a normal schedule. (Ed. R. 313).

On April 19, 2005, an incident occurred at school during which Doe began throwing books and chairs and kicking and hitting teachers. One teacher suffered a broken nose after being struck by a book thrown by Doe. The school resource officer was called to assist in calming Doe. After observing Doe's behavior, the school resource officer made the decision to call the sheriff's office. Sheriff Reeder responded to the call. After observing Doe, Sheriff Reeder made the decision to take Doe into custody.

Doe's mother describes the April 19, 2005, incident as follows. She stated that she received a call from the School principal, Ms. Frey, asking her to come to school and pick up her son because he had punched a teacher in the nose. Doe's mother claims that she asked Ms. Frey to fax her a note describing what had just happened, after which she would be right down to get him. Doe's mother does not indicate how long she delayed going to pick up her son although it was at least long enough for her to have a telephone discussion with her parent disability advocate, after which she left to go to the school. (Doe's mother's Affidavit, Exh. 1, ¶ 13).

Doe's mother arrived at school to find Kelli Rainey, Ms. Frey, Sheriff Reeder, Mike Surrett, Ms. Locket, Mr. Tyler and other staff members gathered outside in the front of the school near a police car where Child Doe, then 12 years old, was being detained in the backseat.

According to Doe's mother, Sheriff Reeder advised her that her son was in custody because criminal charges had been filed as a result of Child Doe's violent conduct, which included throwing a chair and punching Ms. Story in the face. Sheriff Reeder refused to allow Doe's mother to speak with her son. Sheriff Reeder advised Doe's mother that he was taking Doe to Baptist Health Center to be placed in a program called "Recovery Teen." Doe's mother met Sheriff Reeder and Officer Surrett at Baptist Hospital where Doe's mother filled out paperwork necessary to admit her son.[9] (*Id.* at ¶ 13).

On May 9, 2005, the parties entered into a settlement agreement of the due process complaint filed with the Arkansas Department of Education. Doe's parents agreed to dismiss their complaint and to release the school district from liability under the IDEA. The settlement agreement explicitly provided that it was not resolving the Parents' claims raised under § 504, the ADA, and other statutes "except to the extend that remedies under other statute are also available under the IDEA." (Settlement Agreement, Exhibit B to EESD's motion).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of

---

[9] Doe's mother suggests in her Affidavit that she signed the papers because she had no choice since Sheriff Reeder was insistent that Child Doe be placed in a facility or taken to juvenile hall.

either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, i.e., "[to] point[] out to the District Court,'" that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof

at trial. *Celotex Corp.*, 477 U.S. at 322.

# DISCUSSION

The same claims are asserted against all Defendants.  The Court will first discuss the April 19, 2005, incident during which Plaintiff was taken into custody by Sheriff Reeder.  It will then address the various legal claims asserted by the Plaintiff.

### (A)  Arrest of Child Doe on April 19, 2005

Plaintiffs in their Complaint allege that the Defendants "contacted and solicited police interventions with Child Doe at school on several occasions, and in particular on April 19, 2005, when Defendants sought to remove Child Doe from the District and caused Child Doe to be handcuffed and locked inside a police car in front of his peers, parents, and District staff for the specific purpose of assuring that Child Doe and his Parents experienced fear, emotional distress, and humiliation and to avoid providing Child Doe an education within the District."  (Complaint at ¶ 20).  Plaintiffs indicate that part of their compensatory damages includes medical expenses, including bills from the Recover Teen program at Baptist Hospital totaling more than $ 6,600.00.

As described above, on April 19, 2005, Doe was taken into custody at school by Perry County Sheriff Jim Reeder.  Sheriff Reeder was contacted by Mr. Surrett, the resource officer, after Mr. Surrett was unable to calm Doe down.  The School Defendants seek a court ruling that they may not be held responsible for the actions of the officers who arrested Doe.

The Court agrees with the School Defendants that they may not be held responsible for Sheriff Reeder's decision to take Doe into custody.  *See Valentino C. v.  School Dist. of Philadelphia*, No. 01-2097 (E.D. Pa. 2003). The Court holds as a matter of law that none of the Defendants may be held liable for the actions taken by Sheriff Reeder or for Doe's one week stay in residential treatment.

### (B)  IDEA Claims

Plaintiffs concede that they are not bringing any claims under the IDEA and may not recover damages under the IDEA. *See Heidemann v. Rother*, 84 F.3d 1021, 1033 (8th Cir. 1996)(compensatory and punitive damages are not available under the IDEA). Thus, this issue appears moot.

Plaintiffs are, however, seeking to recover damages under other federal statutes for some of the same conduct alleged to have violated the IDEA. Plaintiffs appear to have attempted to preserve such right in settling their IDEA claims.

**(C)** **§ 504 of the Rehabilitation Act and the ADA**

Title II of the ADA "prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity." *Randolph v. Rodgers,* 170 F.3d 850, 857 (8th Cir.1999). Similarly, § 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability ... shall ... be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a) (2000). The Eighth Circuit has held that the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504 of the Rehabilitation Act. *Birmingham v. Omaha School Dist.,* 220 F.3d 850, 856 (8th Cir. 2000).

"Where alleged ADA and § 504 violations are based on educational services for disabled children, the plaintiff must prove that school officials acted in bad faith or with gross misjudgment." *Id*. at 856. Plaintiffs assert that the Defendants intentionally and in bad faith denied Doe access to a classroom, educational instruction, peer interaction, and appropriate supports.

Plaintiffs contend that the Defendants have been deliberately indifferent to Doe's

disability and his educational needs. Doe's mother contends that the Defendant Frey repeatedly ignored her repeated requests for staff training and education. She alleges that Defendant Frey denied such requests and instead stated or implied that Doe's actions were intentional and that Doe's mother was excusing it. Defendant Frey is alleged to have discussed Doe's behaviors in a mean-spirited and hateful way in front of Doe and in open areas where others could hear her comments.

Plaintiffs assert that when they complained to Defendant Frey that certain teachers were not following Doe's IEP and the Behavior Intervention Plan ("BIP"), she refused to enforce it, telling them that she "couldn't make teachers do those things." Defendant Frey is alleged to have failed to make arrangements for Doe to receive any instruction on days when his special education teacher was absent. Plaintiffs contend that Frey's "plan" was to simply place Doe in his homeroom classroom all day without necessary and specialized accommodations and supports. These are a few examples of ways in which Ms. Frey is alleged to have acted with deliberate indifference.

Defendant Rainey is alleged to have been deliberately indifferent to Doe's disability and his educational needs. The Court is concerned with Plaintiffs' allegations that Rainey may have falsified or sanitized Doe's IEP records in a manner that made is appear that services were being provided appropriately or to place Doe's parents in a false light. The Court is further concerned by the allegations that Rainey used "invidious threats" and "subtle coercion" toward Doe and his teachers in attempting to force his placement in a residential treatment facility in order to avoid implementing his IEP and BIP with the teachers and staff. Finally, Plaintiffs contend that Rainey called and threatened Doe's father to "rescind the [due process] complaint or else." Rainey denies that she called Doe's father, but admits calling Chris Wallace, Doe's parents

advocate, to inquire about the parents willingness to dismiss the due process complaint.

Defendant Tyler is alleged to have participated in, endorsed and/or approved the actions of Defendants Frey, Rainey and others in the EESD. Plaintiffs assert that Tyler was present at various times when Doe was having problems in school and during the April 19th incident. Plaintiffs contend that Defendant Tyler refused to provide written documentation regarding the April 19th incident so Doe's mother could provide the information to Doe's son's treating physicians.[10]

The above is in no way intended as a thorough review of the voluminous summary judgment record. It simply highlights some of Plaintiffs' allegations which may not be dismissed as factually untrue at this stage on this record. The Court agrees with the School Defendants that Doe's educational records, if accurate, would compel a decision in Defendants' favor. However, the Court is confronted with a situation in which Plaintiffs allege that the educational records and IEP meetings, in essence, were a sham and that they do not accurately reflect the manner in which the Defendants dealt with Doe's acknowledged disability in the educational setting. Following a review of all of the evidence and considering same in a light most favorable to the Plaintiffs, the Court concludes that questions of fact exist regarding whether the Defendants acted in bad faith or with gross misjudgment.

Defendants contend that Plaintiffs' claims against the officials in their individual capacities for violating § 504 and the ADA must be dismissed. *See Doe v. Barger*, 193 F.Supp.2d 1112, 1116-117 (E.D. Ark. 2002)(citing *Garcia v. S.U.N.Y. Health Services Ctr. of*

---

[10] The Court notes that evidence against Mr. Tyler is very thin. However, the School Defendants have not attempted to distinguish between the allegations of wrongdoing with respect to the three individual defendants. Instead, they have chosen to rely on the school records as demonstrating that none of them acted in bad faith or with gross misjudgment. For that reason, the Court will not dismiss Mr. Tyler, in his official capacity, at this time.

*Brooklyn*, 280 F.3d 98, 107 (2nd Cir. 2001)(§ 504 of the Rehabilitation Act does not provide for individual capacity lawsuits against state officials)); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999). Plaintiffs have not presented any legal authority to the contrary. Accordingly, the ADA and § 504 claims against the Defendants in their individual capacities will be dismissed.

### (D) Constitutional Claims

Plaintiffs' Complaint asserts a cause of action for 42 U.S.C. § 1983 in a general fashion. The Complaint does not mention the United States Constitution, except in the prayer for relief. Accordingly, the Court would not construe the Complaint to have raised any constitutional claims and would have believed that Plaintiffs asserted § 1983 solely for the purpose of enforcing their federal rights under § 1983. *See Livadas v. Bradshaw*, 512 U.S. 107 (1994)(Section 1983 provides a federal cause of action for violations of federal statutes, as well as constitutional violations). Defendants have moved for summary judgment on any claims based on equal protection or due process violations. Plaintiffs have not specifically opposed such argument.

Defendants argue that Plaintiffs' equal protection claim fails because the Plaintiffs do not allege that Child Doe was disciplined differently than others who acted in a similar manner or that there was selective enforcement of any school or classroom rules. See *Costello v. Mitchell Pub. Sch. Dist*. 79, 266 F.3d 916, 921 (8th Cir. 2001)(quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)(per curiam). Defendants argue that any substantive due process claim must fail because the Plaintiffs' pleadings and affidavits fail to demonstrate conduct that shocks the conscience, as required to prevail on the claim in the Eighth Circuit. See *Wise v. Pea Ridge School District*, 855 F.2d 560, 564 (8th Cir. 1988); *Golden Ex Rel. Bach v. Anders*, 324 F.3d 560, 652 (8th Cir. 2003).

The Court agrees with Defendants, for the reasons stated in their briefs and unopposed by Plaintiffs, that the Defendants are entitled to judgment as a matter of law on any claims that they committed equal protection, due process or any other constitutional violations.

**(E)    State Law Claims**

Plaintiffs assert three supplemental state law claims: (1) outrage; (2) assault; and (3) professional negligence.  The School Defendants have moved for judgment as a matter of law on the outrage and professional negligence claims.

Defendants contend that the allegations in the Complaint and supporting affidavits do not rise to a level sufficient to state a claim for the tort of outrage.  The Court agrees.  *See Key v. Coryell*, 86 Ark. App. 334, 343-44 (2004)(affirming dismissal of outrage claim against teacher who yelled at and mistreated student).

The Court also dismisses Plaintiffs' claim for professional negligence.  Arkansas does not recognize such claims in the context of educator-student relationships.  *See Key v. Coryell*, supra, 86 Ark.  App. at 346-47 (no cause of action for educational malpractice in Arkansas).

None of the Defendants have moved for summary judgment on the assault claim.

**(F)    Discovery and Trial**

The Court directs the parties to confer immediately for the purpose of discussing and planning any discovery necessary to prepare this matter for trial.  The Court proposes to schedule the remaining claims for a bench trial during the week of **September 10, 2007,** in the event full discovery is to be conducted, or alternatively, the week of **July 9, 2007**, if limited or no discovery is to be conducted.  The parties are directed to confer immediately to discuss all scheduling issues.  The parties (jointly or separately) shall submit to the Court their proposals for a discovery deadline and a trial date not later than **April 16, 2007.**

Prior to trial, the Court will require the parties to submit briefs fully stating their legal positions. The Court is particularly interested in a more in-depth legal discussion of the remaining claims.

**CONCLUSION**

For the reasons herein stated,

IT IS HEREBY ORDERED THAT the School District Defendants' Motion for Summary Judgment (Docket No. 13) and Ms. Rainey's Motion for Summary Judgment (Docket No. 35) be, and they are hereby, GRANTED in part and DENIED in part. Plaintiffs' claims for violation of the United States Constitution, the tort of outrage, and professional negligence are hereby dismissed WITH PREJUDICE. Plaintiffs' claims against Defendants Rainey, Frey and Tyler, in their individual capacities, for violation of the ADA and § 504 are also dismissed.

IT IS SO ORDERED this __3rd__ day of April, 2007.

_/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE